## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

ALESSANDRO LAURENT, Individually and On
Behalf of All Others Similarly Situated,

      Plaintiff,

v.

DMC GLOBAL INC., MICHAEL KUTA, and
ERIC V. WALTER,

      Defendants.

---

## CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND JURY DEMAND

---

Plaintiff Alessandro Laurent ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding DMC Global Inc. ("DMC Global," "DMC," or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the

Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired DMC Global securities between January 29, 2024 and November 4, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

4.       Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). DMC Global is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

5.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff, as set forth in the attached Certification, acquired DMC Global securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant DMC Global is a Delaware corporation with principal executive offices located at 11800 Ridge Parkway, Suite 300, Broomfield, Colorado 80021.  The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "BOOM."

8.      Defendant Michael Kuta ("Kuta") has served as DMC Global's President, Chief Executive Officer ("CEO") and a member of its Board of Directors ("Board") since August 2023.  He previously was DMC Global's interim co-CEO from January 2023 until August 2023.  From 2014 to January 2023, Kuta was DMC Global's Chief Financial Officer ("CFO").  On November 13, 2024, the Company announced that Kuta would retire as the Company's President, CEO and as a member of the Board effective November 29, 2024.

9.      Defendant Eric V. Walter ("Walter") has served as the Company's CFO since January 2023.

10.      Defendants Kuta and Walter are collectively referred to herein as the "Individual Defendants."

11.      The Individual Defendants possessed the power and authority to control the contents of DMC Global's SEC filings, press releases, and other market communications.  The

3

Individual Defendants were provided with copies of DMC Global's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with DMC Global, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

12.    DMC Global and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

13.    DMC Global began as an unincorporated business named "Explosive Fabricators," established in Colorado in 1965.  It was incorporated in 1971 under the name "E.F. Industries, Inc.," which later became "Explosive Fabricators, Inc."  The Company went public in 1976.  In 1994, it rebranded as "Dynamic Materials Corporation."

14.    In 2001, DMC Global acquired substantially all of the stock of NobelClad Europe SA, a French company, expanding its explosive metalworking operations into Europe.  In 2007, the Company acquired DynaEnergetics GmbH & Co. KG, a German company, along with its affiliates, further enhancing its European operations and adding a complementary energy products business.

4

15.    In 2013, DMC Global consolidated its explosive metalworking operations under the NobelClad brand and, in 2014, rebranded its energy products segment as DynaEnergetics.  The Company changed its name to DMC Global Inc. in 2016.  In 2021, DMC Global acquired a 60% stake in Arcadia Products, LLC ("Arcadia Products"), diversifying its market reach and expanding its addressable markets.

16.    As a result, DMC Global is now a publicly-traded, diversified industrial company that operates through three main business and reporting segments: (i) Arcadia Products: specializing in architectural building products, including composite decking, railing, and other outdoor living products; (ii) DynaEnergetics: focusing on energy products, particularly in the oil and gas industry, offering perforating systems and other well-completion tools; and (iii) NobelClad: developing and manufacturing explosion-resistant composite metals used in various industries, including oil and gas, marine, and defense.

17.    During the years ended December 31, 2023 and 2022, Arcadia Products represented approximately 42% and 46% of DMC Global's consolidated net sales, DynaEnergetics represented approximately 44% and 40%, and NobelClad represented approximately 15% and 14%, respectively.

18.    In 2023, DMC Global initiated a plan to improve its operations and systems, and evaluate and develop new operating strategies for its three business units.

19.    On January 5, 2023, the Company announced that James Chilcoff ("Chilcoff") had been appointed as President to lead Arcadia Products.  A DMC Global press release stated:

> "Jamie is an accomplished leader in the building products industry," said Kevin Longe, president and CEO of DMC. "His extensive background in operations, manufacturing, sales, supply chain, finance and product-line management will be invaluable as Arcadia continues to streamline operations, increase production

capacity and expand the markets for its commercial exterior, commercial interior and high-end residential product lines."

20.    On August 7, 2023, the Company announced that Kuta had been appointed President, CEO and director, "effective immediately."  The press release quoted the Company's Chairman as stating: "Mike's leadership skills, strategic thinking, and deep knowledge of DMC's businesses and culture made it clear he was the ideal person to lead the Company. The [B]oard and I look forward to supporting Mike and his leadership team as they aggressively work to execute on DMC's strategy and move the Company forward."

21.    On November 13, 2023, the Company announced that James O'Leary ("O'Leary") had been appointed to be an independent director.  The press release quoted the Company's Chairman as stating: "Jim brings a wealth of relevant experience and expertise to the DMC [B]oard, and we are thrilled to welcome him as a new director. His insights and guidance will be invaluable as DMC continues to execute its strategy."

22.    DMC Global's primary division, Arcadia Products, which was acquired in 2021, accounted for all of the goodwill on DMC Global's books.  According to DMC Global's SEC Form 10-K for the year ended December 31, 2023, at that time the carrying value of its goodwill was $141,725,000.  The Company further described how it accounted for "goodwill" as follows:

> Goodwill represents the amount by which the purchase price exceeds the fair value of identifiable tangible and intangible assets and liabilities acquired in a business combination. Goodwill acquired in a business combination and determined to have an indefinite useful life is not amortized, but instead is tested for impairment at least annually during the fourth quarter or whenever events or changes in circumstances indicate that the carrying value might not be fully recoverable. For goodwill, impairment is assessed at the reporting unit level. A reporting unit is defined as an operating segment or a component of an operating segment to the extent discrete financial information is available that is reviewed by segment management. The Company's reporting units are each of the three operating segments disclosed in Note 10 within Item 8 — Financial Statements and Supplementary Data.

To test goodwill for impairment, we first perform a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. For the qualitative assessment, we consider macroeconomic and market conditions, cost factors, financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value during the qualitative assessment, then we quantitatively estimate the fair value of the reporting unit and compare the estimated fair value to its carrying value. Based on the results of the quantitative assessment, if the carrying value exceeds the fair value of the reporting unit, an impairment loss is recognized for the difference.

The assumptions used in a quantitative assessment require significant judgment, which include assumptions about future economic conditions and company-specific conditions and plans. In the Company's quantitative assessment, we estimate the fair value of a reporting unit by using the income approach, specifically a discounted cash flow analysis. A number of assumptions and estimates are required in performing the discounted cash flow analysis, including forecasts of revenues, gross profits, capital expenditures, discount rates, working capital changes, and terminal growth rates. Actual results may differ from those assumed in the forecasts.

As of December 31, 2023, the carrying value of goodwill was $141,725[,000] and relates entirely to the Arcadia Products operating segment and reporting unit. As of the date of the 2023 annual impairment test, we performed a quantitative assessment and concluded that the fair value of the Arcadia Products reporting unit exceeded its carrying value by approximately 10%. Discount rates are one of the more significant assumptions used in the income approach. If the Company increased the discount rate used by approximately 100 basis points, the fair value of Arcadia Products would still exceed its carrying value. A sustained decline in general economic conditions, activity levels in end markets or equity valuations could impact the judgments and assumptions used to estimate the fair value of Arcadia Products, and the Company could be required to record an impairment charge in the future. If the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and Consolidated Statements of Operations and Comprehensive Income (Loss) could be materially impacted; however, the non-cash charge would not impact the Company's consolidated cash flows, current liquidity, and capital resources.

### Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on January 29, 2024, when DMC Global issued a press release entitled, "DMC Global Announces Strategic Alternatives Process for DynaEnergetics and

NobelClad Businesses."  The press release described Arcadia Products as the Company's "core division," and it also stated in relevant part:

> [DMC Global] today announced its board of directors ("the Board") has initiated a review of strategic alternatives for its DynaEnergetics and NobelClad businesses.
>
> The strategic review process formalizes DMC's ongoing efforts over the past several months to consider opportunities for unlocking shareholder value. The Board has retained a financial advisor and may retain other advisors to assist the Board in evaluating DMC's current strategy, operations, and capital structure. The Board will consider various strategic, business, and financial alternatives for DMC's DynaEnergetics and NobelClad businesses. These could include, among other things, a sale, a merger or other business combination of a portion of DMC's business-unit assets, and/or a strategic investment.
>
> David Aldous, DMC's chairman, said, "One year ago, we began evaluating and developing new operating strategies for our business units. Since Michael Kuta's appointment as CEO less than six months ago, we have been executing those strategies, and now are focused on opportunities to maximize the value of our portfolio with the help of our financial advisor."
>
> Aldous continued, "Arcadia Products is a core division of DMC, and we are taking a very focused approach toward maximizing its differentiated business model and capitalizing on growth opportunities within its large addressable markets. Both DynaEnergetics and NobelClad are valuable, industry-leading businesses with strong margin profiles. However, the Board and management team are aligned with the view expressed by many DMC shareholders that the Company should seek to simplify its portfolio to drive improved shareholder value. During the review process, the Board and management team will continue to execute DMC's strategy and will remain very focused on running our businesses."

24.    On May 2, 2024, after the markets closed, DMC Global issued a press release entitled, "DMC Global Reports First Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by Defendant Walter.  The press release announced Q1 2024 results including: $2.3 million in net income; $4.2 million in adjusted net income; $0.21 adjusted diluted EPS; $16.7 million in adjusted EBITDA (attributable to DMC Global); and $19 million total adjusted EBITDA, inclusive of non-controlling interest ("NCI").  The press release also included

Q2 2024 guidance including $161 million to $171 million in sales ($64 million to $68 million attributed to Arcadia) with adjusted EBITDA of $14 million to $17 million (including $7 million to $9 million attributed to Arcadia before NCI allocation).

25.     The press release further stated, in part:

"DMC's first quarter sales declined 9% versus the same quarter last year, reflecting challenging market conditions at two of our three industrial manufacturing businesses," said Michael Kuta, president and CEO. "***Arcadia Products, our architectural building products business, was impacted by a late-quarter slowdown in short-cycle commercial activity, lower sales at its high-end residential division, and an approximately 10% decline in aluminum pricing versus last year's first quarter***. DynaEnergetics, our energy products business, reported steady demand and record unit sales of its industry-leading DynaStage perforating system, but was impacted by ongoing pricing pressure in its primary North American onshore market. NobelClad, our composite metals business, delivered strong first quarter results, with sales and adjusted EBITDA above our forecasts."

***Arcadia Products reported first quarter sales of $61.9 million, down 23% from last year's first quarter. Adjusted EBITDA margin was 9.5%, down from 13.0% in the first quarter last year. The drop off in short-cycle commercial sales at certain Arcadia service centers reflects soft construction activity in portions of Arcadia's western and southwestern U.S. service territory, while Arcadia's ultra-high-end residential division experienced a sharp decline in its order backlog in March***.[1]

26.     On May 2, 2024, after the markets closed, DMC Global also filed its Q1 2024 Form 10-Q with the SEC which was signed by Defendant Walter and Brett Seger, the Company's Chief Accounting Officer.  The Form 10-Q repeated the Q1 2024 results from the press release including: $2,319,000 in net income; $4,167,000 in adjusted net income; $0.21 adjusted diluted EPS; $16,683,000 in adjusted EBITDA (less EBITDA attributable to NCI); and $19,045,000 total adjusted EBITDA.  The Form 10-Q also reported goodwill of $141,725,000 as of March 31, 2024.

---

[1] All emphases included herein are added unless otherwise indicated.

27. Attached to the Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by the Individual Defendants, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The Form 10-Q also stated the following with respect to the Company's evaluation of its disclosure controls and procedures:

> Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, and they have concluded that these controls and procedures are effective.

28. Later, on May 2, 2024, DMC Global held a conference call with analysts and investors to discuss the Company's Q1 2024 results. On the call, Defendant Kuta had the following colloquy with a participating analyst:

> [Analyst] Do you know how much of that storefront business is new build versus like replacement type business? Or is that just hard to gauge because it's – you have trucks lining up there just taking sticks every day. You may not [indiscernible] curious if you have – is it a new build or replacement or too hard to tell?
>
> [Kuta] It's too hard to tell right now. ***We're actually getting a lot of good visibility now out of our ERP system***. We're not there on that yet, [Analyst]. Hopefully, in the coming months, quarters, we can start talking a little bit more about that. But it's certainly a mix of new build and repair and remodel.
>
> [Analyst] Got it. And then speaking to the ERP system. I did a quick – aluminum prices actually looked like they kind of spiked a little bit through April past. ***There's been a little bit of mismatch between sort of inventory coming out, product going out with the ERP system, right? Any concern there?*** Or we sort of move beyond that or...
>
> [Kuta] ***I don't see any concern there. There's a tick up there in aluminum. Hopefully, we might even be able to capture some margin there. So I don't think anything to be concerned about***. Maybe even a little bit upside there as we kind of move through the year.

29.     Defendants' statements in ¶¶ 23–28 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts about DMC Global's business, operations, and prospects which were known to Defendants or recklessly disregarded by them: (i) the goodwill associated with Acadia Products was overstated due to the adverse events and circumstances affecting that reporting segment; (ii) DMC Global's materially inadequate internal systems and processes were adversely affecting its operations; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate guidance and that its public disclosures were timely, accurate, and complete; (iv) as a result, Defendants misrepresented DMC Global's operations and financial results; and/or (v) as a result, the Company's public statements were materially false, misleading, or lacked a reasonable basis when made.

30.     On August 1, 2024, after the markets closed, DMC Global issued a press release entitled, "DMC Global Reports Second Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by Defendant Walter.  The press release announced Q2 2024 results including: $6.3 million in net income; $5.7 million in adjusted net income; $0.29 adjusted diluted EPS; $19.4 million in adjusted EBITDA (attributable to DMC Global); and $24.4 million total adjusted EBITDA, inclusive of NCI.  The press release also included Q3 2024 guidance including $158 million to $168 million in sales ($64 million to $68 million attributed to Arcadia Products) with adjusted EBITDA of $15 million to $18 million (including $10 million to $12 million attributed to Arcadia Products before non-controlling interest allocation).

31.     On August 1, 2024, after the markets closed, DMC Global also filed its Q2 2024 Form 10-Q with the SEC which was signed by Defendant Walter and Brett Seger, the Company's

Chief Accounting Officer.  The Form 10-Q repeated the Q2 2024 results from the press release including: $6,293,000 in net income; $5,675,000 in adjusted net income; $0.29 adjusted diluted EPS; $19,420,000 in adjusted EBITDA (less EBITDA attributable to NCI); and $24,398,000 total adjusted EBITDA.  The Form 10-Q also reported goodwill of $141,725,000 as of June 30, 2024.

32.    Attached to the Form 10-Q were SOX certifications signed by the Individual Defendants attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  The Form 10-Q also stated the following with respect to the Company's evaluation of its disclosure controls and procedures:

> Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, and they have concluded that these controls and procedures are effective.

33.    Later, on August 1, 2024, DMC Global held a conference call with analysts and investors to discuss the Company's Q2 2024 results.  On the call, Defendant Kuta had the following colloquy with a participating analyst:

> [Analyst] *I guess I'll start with Arcadia. Obviously, the market is still pretty weak. It looks like you're expecting revenue down sequentially here from second quarter. I know you're not ready to give fourth quarter guidance or anything, but I'm curious about what the customers are kind of saying in terms of longer-term visibility? And how they're kind of thinking about stabilization or timing of stabilization within that market specifically?*
>
> [Kuta] I think that we've got a couple of -- I mean, just looking at the indicators out there and that we all look at, whether it's ABI in the West at 43 spot run or the Dodge Momentum Index, which points towards some favorable end markets, but once again driven by very kind of specific markets like data centers [indiscernible]. So I mean, you see all the same data that we do. ***From a customer perspective, I***

*think we're seeing – it's going to be soft markets for a couple of quarters here as we go out into the year.*

I think the good -- and in particular, when you look at our Q2, we were pretty resilient. We're seeing, obviously, our exposure to diverse end markets. Our bookings are relatively consistent and quoting activity has been good. ***But there's folks citing interest rates that are pushing projects out.***

*So look, I think we've got a couple more quarters of softness. But I do think our guidance -- we guided in Q2 64% to 68%, Q3 is another 64% to 68% because that's sort of what the market is serving up. What we're doing though is the things that we can control, and we're talking about improving our operational effectiveness is really driving the profitability and the EBITDA at the bottom line and driving cash flow. And I feel confident that we're going to do that the remainder of this year for whatever the market serves up.*

34.    Defendants' statements in ¶¶ 30–33 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts about DMC Global's business, operations, and prospects which were known to Defendants or recklessly disregarded by them: (i) the goodwill associated with Acadia Products was overstated due to the adverse events and circumstances affecting that reporting segment; (ii) DMC Global's materially inadequate internal systems and processes were adversely affecting its operations; (iii) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate guidance and that its public disclosures were timely, accurate, and complete; (iv) as a result, Defendants misrepresented DMC Global's operations, financial results, and outlook; and/or (v) as a result, the Company's public statements were materially false, misleading, or lacked a reasonable basis when made.

35.    On October 9, 2024, after the markets closed, DMC Global filed a Form 8-K with the SEC which said in relevant part:

On October 8, 2024, James Chilcoff stepped down as President of Arcadia Products, LLC ("Arcadia"), the architectural building products segment of DMC

13

Global Inc. (the "Company"), effective immediately. In connection with Mr. Chilcoff's departure, the Company and Mr. Chilcoff expect to enter into a separation agreement and release pursuant to which the Company will agree to provide Mr. Chilcoff certain severance benefits, contingent upon his execution, delivery and non-revocation of a release of claims against the Company and its subsidiaries, and his compliance with certain covenants contained therein.

36.      Defendants' statements in ¶ 35 were materially misleading when made because they failed to disclose that Chilcoff's removal was due to the abysmal Q3 2024 performance of Arcadia Products which had already caused DMC Global to fall far short of Q3 2024 guidance and Arcadia Product's materially inadequate internal systems and processes which were continuing to adversely affect its operations.   Defendants further had a duty to immediately update DMC Global's Q3 2024 outlook as a result of the foregoing.

**The Truth Emerges**

37.      On October 21, 2024, after market close, the Company issued a press release entitled, "DMC Global Provides Business and Strategic Review Update, Announces Governance Changes," which it also filed on Form 8-K with the SEC, and which stated in pertinent part:

DMC Global [] today provided an update on its business conditions and revised its third quarter financial guidance. The Company also commented on its strategic review process and announced governance changes. DMC said third quarter sales are expected to be approximately $152 million versus prior guidance of $158 million to $168 million. The results reflect weaker-than-expected sales at both Arcadia Products ("Arcadia"), DMC's architectural building products business, and DynaEnergetics, DMC's energy products business.

Adjusted EBITDA* is now expected to be approximately $5 million versus prior guidance of $15 million to $18 million. Third quarter results will include inventory and bad debt charges at DynaEnergetics totaling approximately $5 million, as well as lower fixed overhead absorption on reduced sales at both Arcadia and DynaEnergetics.

The Company said its third quarter financial results will include an approximate $142 million non-cash goodwill impairment charge associated with DMC's December 2021 acquisition of a controlling interest in Arcadia. The charge reflects

Arcadia's recent financial performance and near-term outlook. These factors, combined with the significant decline in DMC's market capitalization, led the Company to conclude that the goodwill impairment charge was appropriate at this time.

DMC president and CEO Michael Kuta, who is also leading Arcadia on an interim basis, said, "Arcadia's third quarter performance was affected by weak commercial and high-end residential construction activity, lower fixed overhead absorption, and supply-chain disruptions that impacted product availability. Results at DynaEnergetics were below expectations due to declining North American well-completion activity, a higher mix of lower margin customers in DynaEnergetics' U.S. markets, and the aforementioned inventory and bad debt charges. NobelClad, our composite metals business, is expected to deliver another strong quarter with sales and adjusted EBITDA results within or above our forecasted range.

38.     On this news, DMC Global common stock dropped more than 18%, from a $12.93 per share closing price on October 21, 2024, to a close of $10.57 per share the next day, on extremely high volume.

39.     Then, on November 4, 2024, after market close, the Company issued a press release entitled, "DMC Global Reports Third Quarter Financial Results," which it also filed on Form 8-K with the SEC, and in which it reported Q3 2024 sales of $152.4 million, a $159.4 million net loss (inclusive of a $141.7 million goodwill impairment charge at Arcadia Products), and adjusted EBITDA of $5.7 million. The press release further stated, in part:

At Arcadia, DMC's architectural building products business, persistent high interest rates have impacted sales to the high-end luxury home market and have resulted in continued soft commercial construction activity. Under the direction of a new interim business president, Arcadia is executing a series of internal initiatives designed to strengthen sourcing and supply chain functions; improve sales, inventory and operations planning processes; and more effectively leverage Arcadia's enterprise resource planning system. The business is also reviewing certain product lines that have not consistently met profitability targets.

Arcadia's improvement initiatives are being led by interim president Chris Scocos, who joined the business in September 2024 with a 25-year track record of implementing lean manufacturing, process improvement and operational

excellence programs for industrial manufacturing businesses across a broad range of industries, including building materials and industrial manufactured products.

40.    Later, on November 4, 2024, the Company held a conference call with analysts and investors to discuss its Q3 2024 results.  On the call, Defendant Kuta stated in part:

Arcadia, our architectural building products business, reported third quarter sales of $57.8 million, down 17% sequentially and down 19% versus the third quarter last year. Arcadia's third quarter Adjusted EBITDA margin was 5.8%, down from 17.8% in the second quarter and 18.8% year over year. The decline principally reflects lower fixed cost absorption on reduced sales.

Persistently high interest rates have negatively affected sales to Arcadia's high end luxury home market and also slowed commercial construction activity in several Arcadia's regional markets. Arcadia's third quarter is also impacted by supply chain disruptions that limited product availability.

We recently named Chris Scocos as our new Interim President at Arcadia. He brings an extensive background in lean manufacturing, operational excellence and improving plant productivity. His immediate focus is on strengthening sourcing and supply chain functions, improving sales inventory and operations planning processes and more effectively leveraging Arcadia's ERP system. We also are reviewing certain product lines that have not consistently met our profitability targets.

41.    On the call, DMC Global's Executive Chairman (and soon to be interim President and CEO), O'Leary, and Defendant Kuta had the following colloquy with participating analysts:

[Analyst] Guys, I was hoping maybe to discuss a little bit more about the work they want to do at Arcadia and to improve operations. And then as maybe a subset to that question, are the systems in place to manage that? You talked about the ERP explicitly leveraging that, but just curious if all the systems are in place and then to go into a little bit more detail and maybe where some of the low-hanging food is or what have you, and what's the path forward on that front?

[O'Leary]  I'm going to turn it over to Mike on some of the specific initiatives that he and Chris [Scocos] have been initiating, accelerating, and I think pushing forward with the right skill sets for rarely the first time since the acquisition. A macro comment, which I think, again, we might have underestimated and certainly contributed to the goodwill write-off. We bought a family business. We bought a family business that had excellent commercial people. They understood pricing, they understood their markets. They had the right titles, the right org charts, the

right people that at first blush look like they'd be able to handle the amount of change that comes with being a public company.

And the digestion issues around ERP, putting in compliance around being a public company, making sure you've got not just people who have the title VP of supply chain, but actually know what that means, particularly in a post-COVID environment. We underestimated the challenges there. And a couple of, we took a few calls after our last press release. And to me, these are things that are simple to diagnose, easy to spot, not really wildly difficult to fix if you have people with the right skill set, but take time. And putting the ERP system on with the aggressiveness of the implementation, dealing with upgrading people happens with every family company acquisition I've ever seen. And really dealing with just the robustness of the systems and the people, exactly what you think in a family company.

The answer was no, and that led to the write-off. We've spotted, diagnosed, have fixes in for all of them, takes a little bit of time. You'd feel a lot better if it was at a time when elections behind us, whichever party puts in place is going help me put a little bit more wind in the sails of the housing market more broadly and construction. And interest rates being a little bit lower would help the high-end residential market. But that said, while it would be nice to have the wind in our sails, we recognize we don't. So we've got initiatives underway that are very specifically targeted to some of the things we probably could have been a little bit more respectful from the get-go on. Mike, you want to talk about some of the specific initiatives?

[Kuta]  Yes, [Analyst], so a couple of things that we're working on with the team relate to supply chain and sourcing so we can do a better job on both supply chain sourcing and planning as well as S&OP processes. So one of the gaps we have there is demand planning and knowing what we need when we need it. So that was, you know, some of my comments around the supply chain disruption. So we've got programs we're putting in place there, working on, you know, the other thing is there's some, there's the other item in the backend of our business is there's some improvements we can certainly make in our finishing operations. So, and a lot of that gets to, you get your supply chain deep bottlenecked and you got to get scheduling right and finishing up. So a lot of work we're doing on that to improve lead times on time and in full deliveries to customers, making sure we've got the shelf stock with product, making progress, but a ways to go. So there's good things happening, but it's going take some time as [O'Leary] mentioned to sort that out.

***

[Analyst]  Okay. Maybe switching over to the restructuring actions you're taking. One, I thought there was already an ERP implementation already kind of in place at Arcadia. So when you talk about the sourcing initiatives, just what's kind of

involved with that? And is there any way to kind of size the cash cost that's going to be associated with some of these restructuring actions you're taking and how long you expect that payback to be?

[Kuta]  So these are additions. We haven't talked specifically about any restructuring, but certainly everything's on the table when you have results like we've had, but there's nothing that we're specifically announcing. All the additions are top grading, upgrading people. You're 100% correct. We've talked about ERP in the past, but it certainly could have gone smoother and really holding people accountable and getting some additional resources are in. The cash costs, it's kind of part of doing business when you're top grading and adding people. Like in the case of Chris [Scocos], Chris [Scocos] is replacing a guy that we let go who had a comparable salary. So it's not a huge incremental cost that we'd put a payback on.

42.     On this news, the price of DMC Global common stock dropped another 6%, from a $9.84 per share closing price on November 4, 2024, to a close of $9.25 per share the next day, on unusually high volume.

43.     On November 13, 2024, the Company announced that Defendant Kuta would retire as the Company's President, CEO and as a member of the Board effective November 29, 2024, and that O'Leary would assume the role of interim President and CEO.

## SCIENTER ALLEGATIONS

44.     During the Class Periods, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

45.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired DMC Global securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DMC Global securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DMC Global or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of DMC Global;

- whether the Individual Defendants caused DMC Global to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of DMC Global securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

51.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- DMC Global securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold DMC Global securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

52.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

54.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DMC Global securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire DMC Global securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for DMC Global securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DMC Global's finances and business prospects.

58.    By virtue of their positions at DMC Global, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made,

although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of DMC Global, the Individual Defendants had knowledge of the details of DMC Global's internal affairs.

60.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DMC Global. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to DMC Global's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of DMC Global securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning DMC Global's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired DMC Global securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

61.     During the Class Period, DMC Global securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DMC Global securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of DMC Global securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of DMC Global securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

64.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of DMC Global, and conducted and participated, directly and indirectly, in the conduct of DMC Global's business affairs.  Because of their senior positions, they knew the adverse non-public information about DMC Global's misstatement of income and expenses and false financial statements.

66.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DMC Global's financial condition and results of operations, and to correct promptly any public statements issued by DMC Global which had become materially false or misleading.

67.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DMC Global disseminated in the marketplace during the Class Period concerning DMC Global's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DMC Global to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of DMC Global within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DMC Global securities.

68. Each of the Individual Defendants, therefore, acted as a controlling person of DMC Global. By reason of their senior management positions and/or being directors of DMC Global, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, DMC Global to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of DMC Global and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DMC Global.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 27, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ J. Alexander Hood II*
J. Alexander Hood II
Jeremy A. Lieberman
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
ahood@pomlaw.com
jalieberman@pomlaw.com

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
(*pro hac vice* application forthcoming)
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorneys for Plaintiff*

Docusign Envelope ID: BA63A08C-7599-4A1C-9623-268342021003

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _Alessandro Laurent_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against DMC Global Inc. ("DMC Global") and authorize the filing of a motion on my behalf for appointment as lead plaintiff.

3.      I did not purchase or acquire DMC Global securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of the Class of investors as defined in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in the relevant securities as set forth in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the Class as defined in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the Class as ordered or approved by the Court.

Docusign Envelope ID: BA63A08C-7599-4A1C-9623-268342021003

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed ___12/15/2024_____
                              **(Date)**

Signed by:

*Alessandro Laurent*

226450D6498848A...
                              **(Signature)**

**DMC Global, Inc. (BOOM)**                                                **Alessandro Laurent**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 3/18/2024 | 1,800 | $17.9000 |
| Purchase/Acquisition | 4/16/2024 | 2,000 | $16.5500 |